IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CHGYM LLC,                          )
                                    )
            Plaintiff,              )
                                    )
      v.                            )        1:21CV911
                                    )
UNIFY ATHLETICS, LLC and VAHID      )
KAVOUS MOAVENZADEH,                 )
                                    )
            Defendants.             )

**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

    Presently before this court is Plaintiff CHGYM LLC's
("Plaintiff" or "CHG") Motion for Temporary Restraining Order
and Preliminary Injunction with Request for Oral Argument, (Doc.
5), against Defendants Unify Athletics, LLC and Vahid Kavous
Moavenzadeh (separately "Unify" and "Moavenzadeh," together
"Defendants"). This court held a hearing on the temporary
restraining order ("TRO") portion of the motion, (Minute Entry
12/16/2021), and subsequently issued a TRO, (Doc. 21). This
court then held a hearing on the preliminary injunction portion
of the motion. (Minute Entry 01/05/2022).

    Because Plaintiff has demonstrated a likelihood of success
on the merits as to its North Carolina computer trespass claim

and met the other requirements for a preliminary injunction, a preliminary injunction will be granted.

I.  **PROCEDURAL HISTORY**

Plaintiff filed its Complaint on November 24, 2021. (Compl. (Doc. 1).) That same day Plaintiff filed a Motion for Temporary Restraining Order and Preliminary Injunction with Request for Oral Argument. (Doc. 5.) Plaintiff also filed a Memorandum in support of its motion. (Pl. Mem. in Supp. of Mot. for TRO/Prelim. Inj. ("Pl.'s Br.") (Doc. 6).) Attached to that memorandum was a Declaration of Amanda Maness, (Decl. of Amanda Maness in Supp. of Pl.'s Mot. for TRO/Prelim. Inj. ("Maness Decl.") (Doc. 6-1), along with multiple exhibits, (Docs. 6-2 — 6-6). Defendants filed a Brief in Opposition to the TRO portion of Plaintiff's motion, (Defs.' Br. in Opp'n to Mot. for TRO ("Defs.' TRO Br.") (Doc. 15)), accompanied by two exhibits, (Docs. 16-1, 16-2), and numerous affidavits, (Docs. 16-3 — 16-37), including one from Defendant Moavenzadeh, (Aff. of Vahid Moavenzadeh ("Moavenzadeh Aff.") (Doc. 16-3)). This court held a hearing as to the TRO portion of Plaintiff's motion, (Minute Entry 12/16/2021), and on December 22, 2021, issued a TRO, (TRO (Doc. 21)). Plaintiff then filed a Reply in Support of Motion for Preliminary Injunction. (Pl. Reply in Supp. of Mot. for Prelim. Inj. ("Pl.'s Reply") (Doc. 25).) Attached to the reply

- 2 -

were two exhibits, (Ex. F ("ICP Log") (Doc. 25-2); Doc. 25-3), and a Supplement Declaration of Amanda Maness, (Suppl. Decl. of Amanda Maness ("Maness Suppl. Decl.") (Doc. 25-1)). Defendants subsquently filed a Brief in Opposition to Motion for Preliminary Injunction, (Defs.' Br. in Opp'n to Mot. for Prelim. Inj. ("Defs.' Prelim. Inj. Br.") (Doc. 28)), along with a Supplemental Declaration of Moavenzadeh, (Suppl. Dec. of Vahid Kavous Moavenzadeh ("Moavenzadeh Suppl. Decl.") (Doc. 28-1)). This court then held a hearing as to the preliminary injunction portion of Plaintiff's motion. (Minute Entry 01/05/2022.)

At the hearing, this court extended the TRO for seven days to allow for the preparation of a written memorandum opinion and order making specific findings of fact and conclusions of law in support of a preliminary injunction. (Id.) Having reviewed the motion, the supporting documents, all matters of record, and the briefing, this court's findings of fact and conclusions of law are contained herein. Infra Parts II—III. These findings and conclusions are supplemental to, and incorporate by reference, those announced at the close of the hearing. Additionally, these findings and conclusions are only made for the purpose of issuing a preliminary injunction.

## II.  __FINDINGS OF FACT__

1. Plaintiff is a youth gymnastics facility. (Maness Decl. (Doc. 6-1) ¶ 2.) It opened in 2011, (id.), and its current majority owner is Amanda Maness, (Maness Suppl. Decl. (Doc. 25-1) ¶ 1). Plaintiff's clients are parents who enroll their children in gymnastics classes. (Maness Decl. (Doc. 6-1) ¶ 8.)

2. In June 2013, Plaintiff hired Defendant Moavenzadeh as a coach. (Id. ¶ 11; Moavenzadeh Aff. (Doc. 16-3) ¶ 3.) In 2018, he was promoted to Team Director. (Maness Decl. (Doc. 6-1) ¶ 13; Moavenzadeh Aff. (Doc. 16-3) ¶ 5.) In this new role, Moavenzadeh's responsibilities included team management activities, (Maness Decl. (Doc. 6-1) ¶ 14; Moavenzadeh Aff. (Doc. 16-3) ¶ 5), but he was not authorized to manage Plaintiff's business generally, nor was he involved in CHG's specific financial affairs, (Maness Decl. (Doc. 6-1) ¶ 14).

3. Plaintiff uses class management software called iClass Pro ("ICP") to assist in ownership, management, operations, and accounting-related tasks. (Maness Decl. (Doc. 6-1) ¶ 22.) ICP enables Plaintiff to send bulk emails and also contains databases that store proprietary and confidential information regarding Plaintiff's clients, students, coaches, and staff. (Id. ¶ 23.) This information includes—but is not limited to—names, contact information, students' class history, Plaintiff's

- 4 -

class history, current class enrollments, what classes
Plaintiff's coaches have taught, client credit card information,
client billing information, and client payment history. (Id.)
The accumulation of information in ICP's databases for over a
decade is one of Plaintiff's most valuable assets. (Id. ¶ 25.)

4. Access to ICP is provided to Plaintiff's staff on a
need-to-use basis. (Id. ¶ 26.) Staff members with access are
provided their own login credentials and are informed that ICP
contains proprietary and confidential information. (Id. ¶¶ 26,
27.) Additionally, their ICP authorization is limited to what is
necessary to perform their respective CHG tasks and duties.
(Id. ¶ 24.) Plaintiff's staff are also informed that the
proprietary and confidential information contained in ICP should
not be shared with staff and third parties who do not
independently have access to such information. (Id. ¶ 27.)

5. Sometime before 2019, Moavenzadeh was granted ICP
access. (Id. ¶ 29.) His ICP authorization was limited to using
the software for routine class-attendance matters and
communication with clients regarding team-related activities.
(Id.) Moavenzadeh used ICP frequently for these tasks. (See
generally ICP Log (Doc. 25-2).) At some point, Moavenzadeh was
given full access to ICP. (See Moavenzadeh Aff. (Doc. 16-3)
¶¶ 9, 10; cf. ICP Log (Doc. 25-2) at 3 (removing Moavenzadeh's

- 5 -

full access rights after his resignation).) However, he was never granted unlimited authorization. (See Maness Decl. (Doc. 6-1) ¶¶ 24, 29.)

6. In August 2020, Moavenzadeh created Instagram accounts to promote and chronicle the accomplishments of Plaintiff's athletes. (Maness Decl. (Doc. 6-1) ¶ 15; Moavenzadeh Aff. (Doc. 16-3) ¶ 8.) The Instagram accounts were named CHG.XCEL and CHG.MENS to represent Plaintiff's female and male teams, respectively. (Maness Decl. (Doc. 6-1) ¶ 16.)

7. When CHG reopened for in-person training after temporarily closing its facilities due to COVID-19, Plaintiff added the role of Operations Manager to Moavenzadeh's responsibilities. (Moavenzadeh Aff. (Doc. 16-3) ¶¶ 7, 9.) As part of this additional role (Moavenzadeh continued to hold the position of Team Director), he assumed a broader portfolio of tasks. (Id. ¶ 9.)

8. On February 27, 2021, unbeknownst to Plaintiff, Moavenzadeh used ICP to generate a report of Plaintiff's recurring billings. (Maness Decl. (Doc. 6-1) ¶ 31; Doc. 6-4; ICP Log (Doc. 25-2) at 20.[1]) Less than a minute after creating the

_____

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

- 6 -

report, Moavenzadeh utilized the "Background Task Cancelled" function,[2] but ICP nevertheless automatically generated and maintained a log that recorded these actions. (Maness Decl. (Doc. 6-1) ¶ 31; Doc. 6-4; ICP Log (Doc. 25-2) at 20.) That log lists Moavenzadeh as having an "unknown" IP address when he generated the report.[3] (Doc. 6-4; ICP Log (Doc. 25-2) at 20.) ICP has no record of him ever generating such a recurring billing report before. (See ICP Log (Doc. 25-2).) These types of reports generally contain information such as the name of the student, contact information, credit card information, and payment history. (Maness Decl. (Doc. 6-1) ¶ 31.) Because Moavenzadeh utilized the "Background Task Cancelled" function, Plaintiff does not know the exact extent or amount of information contained in the report. (Id. ¶ 32.)

9. In June 2021, Moavenzadeh approached at least one of Plaintiff's owners and asked whether the owners were interested

---

[2] Other than the June 11, 2021 reports and July 14, 2021 mass departure email, discussed infra ¶¶ 10—11, the 109-page log listing all of Moavenzadeh's ICP activities, which dates to November 2019, contains only one other entry where he utilized the "Background Task Cancelled" function. (ICP Log (Doc. 25-2) at 79.)

[3] Other than the June 11, 2021 reports, discussed infra ¶ 10, the log listing all of Moavenzadeh's ICP activities features only one other entry with an "unknown" IP address. (ICP Log (Doc. 25-2) at 61.)

in selling CHGYM to him. (Maness Suppl. Decl. (Doc. 25-1) ¶ 7; Moavenzadeh Suppl. Decl. (Doc. 28-1) ¶ 17.)

10. On June 11, 2021, unbeknownst to Plaintiff, Moavenzadeh used ICP to generate reports of Plaintiff's "Family List," "Family Email List," and "Roll Sheets." (Maness Decl. (Doc. 6-1) ¶ 33; Doc. 6-5; ICP Log (Doc. 25-2) at 6—7.) The ICP log lists Moavenzadeh's IP address as "unknown" for each report generation request. (Doc. 6-5; ICP Log (Doc. 25-2) at 6—7.) Within minutes of generating the reports, Moavenzadeh utilized the "Background Task Cancelled" function as to each, (Maness Decl. (Doc. 6-1) ¶ 33; Doc. 6-5; ICP Log (Doc. 25-2) at 6—7), except for the final "Roll Sheets" report he had generated—he had created that report three times, (Doc. 6-5; ICP Log (Doc. 25-2) at 6—7.) ICP has no record of him ever generating these types of reports before.[4] (See ICP Log (Doc. 25-2).) Because Moavenzadeh utilized the "Background Task Cancelled" function," Plaintiff does not know the exact extent or amount of information contained in the "Family List," "Family Email List," and first two "Roll Sheets" reports. (Maness Decl. (Doc. 6-1) ¶ 34.)

11. On July 14, 2021, Moavenzadeh resigned. (Maness Decl. (Doc. 6-1) ¶ 35; Moavenzadeh Aff. (Doc. 16-3) ¶ 23.) That same

_____

[4] This court does note that in late June 2020, Moavenzadeh generated a report titled "Families: Policy Report." (ICP Log (Doc. 25-2) at 61.)

day, he used ICP to send an email to seventeen classes of
Plaintiff's clients notifying them of his departure. (Maness
Decl. (Doc. 6-1) ¶ 35; Moavenzadeh Aff. (Doc. 16-3) ¶ 23;
Doc. 6-6; ICP Log (Doc. 25-2) at 3.) The email expressed
Moavenzadeh's hope to stay in touch and provided his personal
email address. (Maness Decl. (Doc. 6-1) ¶ 36; Moavenzadeh Aff.
(Doc. 16-3) ¶ 23.) Less than a minute after sending the mass
email, Moavenzadeh utilized the "Background Task Cancelled"
function. (Maness Decl. (Doc. 6-1) ¶ 35; Doc. 6-6; ICP Log
(Doc. 25-2) at 3.)

12. On September 13, 2021, Moavenzadeh created the
competing gymnastics entity named Unify Athletics, LLC. N.C.
Sec'y of State, Annual Report: Unify Athletics, LLC, https://www
.sosnc.gov/online_services/business_registration/flow_annual_rep
ort/18083935 (last visited Jan. 12, 2022)[5]; (Maness Decl.
(Doc. 6-1) ¶ 37; Moavenzadeh Aff. (Doc. 16-3) ¶ 28.) Numerous
clients have left CHGYM and joined Unify. (Maness Decl. (Doc. 6-
1) ¶ 41; Moavenzadeh Aff. (Doc. 16-3) ¶ 29; see also e.g., Docs.
16-5, 16-7, 16-8, 16-10, 16-11, 16-13, 16-15, 16-16, 16-17, 16-
18, 16-19, 16-22, 16-23, 16-24, 16-25, 16-27, 16-28, 16-29, 16-
33, 16-35, 16-36, 16-37.)

---

[5] This court takes judicial notice of this public record
pursuant to Federal Rule of Evidence 201.

13. Moavenzadeh also changed the names of the Instagram accounts he had created in August 2020. (Maness Decl. (Doc. 6-1) ¶¶ 39, 40; Moavenzadeh Aff. (Doc. 16-3) ¶ 31; Doc. 6-2; Doc. 6-3.) He changed the name of "CHG.XCEL" to "UNIFY.GYM" and changed "CHG.MENS" to "UNIFYGYM.MENS." (Maness Decl. (Doc. 6-1) ¶ 40; Moavenzadeh Aff. (Doc. 16-3) ¶ 31; Doc. 6-2; Doc. 6-3.)

## III. **CONCLUSIONS OF LAW**

"A plaintiff seeking a preliminary injunction must establish" four prongs: "that [1] he is likely to succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence of preliminary relief, that [3] the balance of equities tips in his favor, and that [4] an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). Such an injunction "is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017) (citation omitted).

Here, Plaintiff has established all four prongs, and therefore this court will issue a preliminary injunction in its favor. This preliminary injunction will preserve the status quo until this case is adjudicated on a more fulsome and developed record. Each prong is addressed in turn.

- 10 -

A. **Likelihood of Success on the Merits**

While Plaintiff has asserted nine claims against Defendants, (Compl. (Doc. 1) ¶¶ 51—107), its preliminary injunction motion was only made pursuant to four of those claims, (Pl.'s Br. (Doc. 6) at 9). Those four claims are (1) misappropriation of trade secrets under federal law, (2) misappropriation of trade secrets under North Carolina law, (3) computer trespass under North Carolina law, and (4) false association under federal law. (Id.)

Through briefing and oral argument, the North Carolina computer trespass claim emerged as the sole claim for which preliminary injunctive relief should issue.[6] Indeed, this court's TRO found that "Plaintiff has a substantial likelihood of succeeding on the merits of its North Carolina computer trespass claim[.]" (TRO (Doc. 21) at 3.) Therefore, at least insofar as the first preliminary injunction prong, this court will focus on the North Carolina computer trespass claim. To demonstrate a

---

[6] This court declined to grant preliminary injunctive relief as to Plaintiff's misappropriation and false association claims. Defendants presented evidence through the affidavits of former CHG clients. (Docs. 16-4 — 16-37.) The allegations in those affidavits suggest there are a number of reasons why clients may have left CHG and moved to Unify. (Defs.' Prelim. Inj. Br. (Doc. 28) at 8—9.) Consequently, as to its claims for misappropriation and false association, Plaintiff did not sufficiently establish a likelihood of success on the merits to support injunctive relief separate and apart from its computer trespass claim.

- 11 -

likelihood of success on that claim, "plaintiff need not establish a 'certainty of success,' but must make a clear showing that [it] is likely to succeed at trial." <u>Di Biase</u>, 872 F.3d at 230 (citation omitted).

North Carolina's computer trespass statute makes it

> (a) unlawful for any person to use a computer or computer network <u>without authority</u> and with the intent to do any of the following:
>
> . . . .
>
> (3) Alter or erase any computer data, computer programs, or computer software.
>
> . . . .
>
> (5) Make or cause to be made an unauthorized copy, in any form, including, but not limited to, any printed or electronic form of computer data, computer programs, or computer software residing in, communicated by, or produced by a computer or computer network.
>
> . . . .
>
> [A] person is "without authority" when . . . the person has no right or permission of the owner to use a computer, or the person uses a computer in a manner exceeding the right or permission[.][7]

N.C. Gen. Stat. § 14-458(a) (emphasis added). To synthesize, the statute has two elements: (1) a person must "use a computer or

---

[7] "The statute provides for a private right of action by '[a]ny person whose property or person is injured by reason of a violation of this section. . . .'" <u>Spirax Sarco, Inc. v. SSI Eng'g, Inc.</u>, 122 F. Supp. 3d 408, 417 (E.D.N.C. 2015) (alterations in original) (quoting N.C. Gen. Stat. § 14-458(c)).

- 12 -

computer network without authority," with (2) the intent to engage in one of the enumerated prohibited actions. Each element is analyzed as follows.

### 1. Element 1: Without Authority

Plaintiff maintains Moavenzadeh was without authority when he generated the February 27 and June 11, 2021 reports because he did so for "personal use," as his work "duties and responsibilities had no relation to needing this information." (Pl.'s Br.'s (Doc. 6) at 16.) Defendants disagree and advance two reasons why Moavenzadeh had authority to generate the reports. First, "CHG gave [Moavenzadeh] 'full access' to iClass Pro, electing not to place any restrictions on his use of the software," (Defs.' TRO Br. (Doc. 15) at 16), thus "expressly authoriz[ing] him to access class enrollment information, contact information, and billing information," (Defs.' Prelim. Inj. Br. (Doc. 28) at 14). Second, Defendants argue that any reports Moavenzadeh may have generated were within his authority because he "was required to regularly access CHG's client lists, class rolls, and customer contact information as part of his responsibilities." (Defs.' TRO Br. (Doc. 15) at 16.)

The North Carolina computer trespass statute provides that "a person is 'without authority' when . . . the person uses a computer in a manner exceeding the[ir] right or permission[.]"

- 13 -

N.C. Gen. Stat. § 14-458(a). When the reports were generated, Moavenzadeh had full access to Plaintiff's ICP databases. Supra ¶ 5. However, just because Moavenzadeh had unlimited access did not mean he had unlimited authorization. While he could access all of ICP, he was only authorized to use that access to the extent it was necessary to perform his CHGYM tasks and duties. Supra ¶¶ 4—5. Any greater utilization of that access would exceed his "right or permission," thus qualifying as "without authority" for purposes of the North Carolina computer trespass statute. N.C. Gen. Stat. § 14-458(a).

Despite Defendants' arguments to the contrary, there is sufficient circumstantial evidence to conclude that the reports Moavenzadeh generated on February 27 and June 11, 2021 were not necessary to perform his CHG tasks and duties. The best evidence of this is that the 109-page log containing all of Moavenzadeh's ICP activities since November 2019 shows that he never generated any reports like the ones at issue. Supra ¶¶ 8, 10. Additionally, Moavenzadeh never offers a credible explanation for why he cancelled the background task for all but one of these reports. See supra ¶¶ 8, 10. To the contrary,

Moavenzadeh's shifting[8] and conflicting[9] explanations of his computer activity cause this court, at this stage of the proceedings, to reject his purportedly innocent explanations for the activity, (see Moavenzadeh Aff. (Doc. 16-3) ¶ 12; Moavenzadeh Suppl. Decl. (Doc. 28-1) ¶¶ 6—7), which otherwise support a finding of unauthorized access. Moreover, the reports' contents would likely aid Moavenzadeh in establishing his own

---

[8] Compare Moavenzadeh Aff. (Doc. 16-3) ¶ 12 ("I recall that in February 2021, I was using iClass Pro and inadvertently downloaded reports from iClass Pro.") (emphasis added), with Moavenzadeh Suppl. Decl. (Doc. 28-1) ¶ 6 ("In my December 15, 2021, affidavit, I used the colloquial term 'downloaded' to describe what I did with respect to the report. By 'downloaded,' I meant that I had iClass Pro 'download' the report to my 'background tasks' folder in iClass Pro. To the best of my knowledge, I did not take the additional step of having iClass Pro 'download' the report to any personal computer or other device.").

[9] Compare Moavenzadeh Aff. (Doc. 16-3) ¶ 12 ("I recall that in February 2021, I was using iClass Pro and inadvertently downloaded reports from iClass Pro. . . I have no recollection of what . . . information was included in the reports.") (emphasis added), with Moavenzadeh Suppl. Decl. (Doc. 28-1) ¶ 6 ("I recall that in February 2021 . . . I inadvertently created a report in iClass Pro that included billing information for certain CHG customers.") (emphasis added).

gymnastics business, which he did in fact later establish.[10] <u>See</u> <u>supra</u> ¶ 12.

Defendants argue that the facts of Moavenzadeh's departure, and the recruitment of Moavenzadeh by the parents rather than vice versa, diminishes the reasonableness of any inference of wrongful conduct by Moavenzadeh. (<u>See e.g.</u>, (Defs.' Prelim. Inj. Br. (Doc. 28) at 1.) This court disagrees. The information that Moavenzadeh accessed without authorization is clearly of business value to Moavenzadeh, a gymnastics coach. No evidence has been presented to suggest that at the time he accessed that information he knew parents would contact him to start a new gym. Perhaps a trial may establish different or new facts that weaken any reasonable inference to be drawn from an unauthorized access of business information followed by the establishment of a competing business. However, the facts presently before this court establish a strong inference that Moavenzadeh accessed computer information without authorization because he did so for an unauthorized purpose, that is, for the benefit of third

---

[10] This court notes that North Carolina computer trespass actions often feature employees leaving for competing businesses. <u>Spirax Sarco</u>, 122 F. Supp. 3d 408; <u>Glover Constr.</u> <u>Co., Inc. v. Sequoia Servs., LLC</u>, No. 18 CVS 1900, 2020 WL 3393065 (N.C. Super. Bus. Ct. June 18, 2020); <u>Constr. Managers,</u> <u>Inc. of Goldsboro v. Amory</u>, No. 18 CVS 1359, 2019 WL 2167311 (N.C. Super. Bus. Ct. May 17, 2019).

- 16 -

parties—namely, himself in a personal capacity and a competing gymnastics business, ultimately established as Unify.

In the aggregate, this circumstantial evidence leads this court to the conclusion that when Moavenzadeh generated the reports he was not doing so as part of his CHG responsibilities. That he was not acting in furtherance of his CHG tasks and duties when he generated the reports means he was "without authority" as defined by the North Carolina computer trespass statute. See N.C. Gen. Stat. § 14-458(a). Therefore, Plaintiff has shown a likelihood of success in establishing the first element of a North Carolina computer trespass claim.

### 2. Element 2: Intent to Engage in Prohibited Action

Implicating subsection (a)(5) of the North Carolina computer trespass statute, Plaintiff argues that "Moavenzadeh violated the Computer Trespass law by making an <u>unauthorized copy</u> of CHG's confidential and proprietary customer lists, customer contact information, roll sheets, and billing records of customers." (Pl.'s Br. (Doc. 6) at 16 (emphasis added).) Additionally, Plaintiff implicates subsection (a)(3) of the statute by alleging that Moavenzadeh "<u>altered or erased computer data</u> in order to hide" his generation of the reports. (Compl. (Doc. 1) ¶ 81 (emphasis added).)

- 17 -

Defendants do not directly address Plaintiff's computer data alteration and erasure allegation. As to Plaintiff's unauthorized copy allegation, Defendants insist that there are two reasons why any report Moavenzadeh may have—or may have received—does not constitute an unauthorized copy. First, Defendants argue that because making "copies of class rolls or contact information [w]as part of his daily responsibilities," those copies cannot be considered unauthorized (Defs.' TRO Br. (Doc. 15) at 16.) And second, Defendants contend that the reports cannot qualify as unauthorized copies because "in the course of forming and operating Unify, [Moavenzadeh] has never used any of the information that [he] may have downloaded, intentionally or accidentally, in the course and scope of his employment with CHG." (Id.)

This court is not convinced by either of these arguments. As to the first, the ICP log refutes Defendants' claim that generating these types of reports was a part of Moavenzadeh's "daily responsibilities." As to the second, it is irrelevant for purposes of a computer trespass claim whether Moavenzadeh ever actually used the information contained in the reports. All that matters, insofar as the claim's second element, is that the reports constitute "unauthorized cop[ies]." N.C. Gen. Stat. § 14-458(a)(5). This court concludes that Plaintiff has shown a

likelihood that they do. Furthermore, this court concludes that Moavenzadeh's utilization of the "Background Task Cancelled" function—which has prevented Plaintiff from uncovering the extent of information contained in the reports—likely qualifies as an "alter[ation] or eras[ure]" of computer data. Id. § 14-458(a)(3).

Therefore, Plaintiff has shown a likelihood of success in establishing the second element of a North Carolina computer trespass claim. Because Plaintiff has done so for both elements, this court concludes that Plaintiff has shown a likelihood of success on the merits of the claim and has thus made "a clear showing that [it] is likely to succeed at trial," Di Biase, 872 F.3d at 230 (citation omitted).

B.    **Risk of Irreparable Harm**

In addition to a likelihood of success on the merits, a plaintiff seeking a preliminary injunction must also make a "clear showing that it is likely to be irreparably harmed absent preliminary relief." Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 347 (4th Cir. 2009) (citation omitted), vacated on other grounds 559 U.S. 1089. "[W]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor . . . the irreparable injury prong is satisfied." Multi-Channel TV Cable

Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 552 (4th Cir. 1994) (citation omitted), abrogated on other grounds, Winter, 555 U.S. 7. "Loss of proprietary or confidential information may also constitute irreparable harm." Creative Snacks, Co., LLC v. Hello Delicious Brands LLC, No. 1:17CV50, 2018 WL 1626522, at *7 (M.D.N.C. Mar. 30, 2018) (citing Zahodnick v. Int'l Bus. Machs. Corp., 135 F.3d 911, 915 (4th Cir. 1997)).

Plaintiff argues that Moavenzadeh's "computer trespass . . . [is] causing, and will continue to cause, irreparable injury[.]" (Pl.'s Br. (Doc. 6) at 20.) Specifically, Plaintiff maintains that "CHG has lost a substantial number of clients already due to Moavenzadeh's" misconduct and absent a "preliminary injunction, CHG has no ability to prevent the continued damage to its business." (Id. at 21.)

Defendants advance two arguments why "the principal purpose served by entering the requested [preliminary injunction]" would not be to prevent irreparable harm but rather to "allay[] CHG's fears." (Defs.' Prelim. Inj. Br. (Doc. 28) at 18.). First, Defendants argue that Plaintiff would suffer no irreparable harm because Moavenzadeh "has averred that he has not, and will not, use any of the . . . information that he appears to have downloaded from iClass Pro[,] in the course and scope of his

employment with CHG[,] as part of the formation or operations of Unify." (Defs.' TRO Br. (Doc. 15) at 18.)

This court finds this first argument wanting. While Defendant Moavenzadeh does aver that he will not use any information downloaded from ICP as part of his work with Unify, (Moavenzadeh Aff. (Doc. 16-3) ¶ 30), this court has reasonable doubts about the general credibility of Moavenzadeh's averments. In the less than two months since this case was initiated, Moavenzadeh has already submitted to this court shifting and contradictory sworn statements. See supra notes 8-9. These inconsistences are significant; they concern matters within the heartland of the case—namely, what Moavenzadeh did with the ICP reports and what information was contained therein. See supra notes 8—9. Such inconsistencies undermine this court's confidence in the credibility of Defendant Moavenzadeh's averments, including his averment that he will not use any of Plaintiff's proprietary ICP data. Therefore, this court rejects Defendants' argument that because Moavenzadeh has sworn he will not use any of Plaintiff's proprietary ICP data, an injunction is unnecessary.

This court is also unconvinced by Defendants' second argument. That argument insists that Plaintiff would not suffer irreparable harm in the absence of a preliminary injunction

because "numerous parents have made clear that they will not allow their children to attend any gymnastics facility operated by the Maness family, including CHG[.]" (Defs.' TRO Br. (Doc. 15) at 19.) Even assuming that to be true, the evidence established for purposes of this motion shows that a current competitor to Plaintiff had (and may still have) Plaintiff's confidential business information without Plaintiff's authorization. The failure to grant an injunction could very well permit Defendants to wrongfully retain and use that information without limitation while Defendants operate a competing business. That circumstance creates an improper competitive advantage for Defendants.

Relatedly, that some former clients may not return to Plaintiff under its current ownership in no way forecloses "the threat of a permanent loss of [other] customers[.]" Multi-Channel TV Cable, 22 F.3d at 552 (citation omitted). For example, current clients who have thus far remained with Plaintiff could be lured to Unify through the use of information contained in the ICP reports that Moavenzadeh generated. See Philips Elecs. N. Am. Corp. v. Hope, 631 F. Supp. 2d 705, 711 (M.D.N.C.2009) (finding irreparable harm where the absence of an injunction "could result in the further loss of customer relationships" (emphasis added)). If that were to occur, the

- 22 -

harm suffered by Plaintiff would "be longstanding and near impossible to remedy retroactively." (TRO (Doc. 21) at 3). In other words, the harm would be "irreparable" because neither party contends that the parents who submitted affidavits, (Docs. 16-4 – 16-37), constitute all of the individuals whose information was accessed by Moavenzadeh without authorization.

Therefore, this court concludes that "the failure to grant preliminary relief" to Plaintiff "creates the possibility of permanent loss of customers to a competitor," namely Unify. Multi-Channel TV Cable, 22 F.3d at 552 (citation omitted). That possibility constitutes a "clear showing" that Plaintiff "is likely to be irreparably harmed absent" a preliminary injunction, Real Truth About Obama, 575 F.3d at 347 (citation omitted), and accordingly "the irreparable injury prong is satisfied." Multi-Channel TV Cable, 22 F.3d at 552 (citation omitted).

## C.    **Balance of Equities**

The third preliminary injunction prong requires that this court determine whether "the balance of equities tips in [Plaintiff's] favor." Winter, 555 U.S. at 20 (citations omitted). This requires assessment of "the harm Defendants will suffer if Plaintiff's motion is granted." Int'l Lab. Mgmt. Corp.

v. Perez, No. 1:14CV231, 2014 WL 1668131, at *14 (M.D.N.C. Apr. 25, 2014).

Defendants argue that the "balance of equities tips heavily in the favor of [Moavenzadeh] and Unify" because "any discontinuation or interruption in Unify's operations will simply serve to undermine the establishment of an entity . . . created by a coalition of parents who pledged both their time and money to create a space where their children can engage in the sport they love in a supporting, healthy, and safe environment." (Defs.' TRO Br. (Doc. 15) at 19.) Defendants express particular concern about the issuance of "an injunction that curtails or in any way impacts [Moavenzadeh]'s ability to contact and communicate with families with which he has a longstanding personal relationship." (Defs.' Prelim. Inj. Br. (Doc. 28) at 18.)

Plaintiff counters that "[n]othing in the terms of CHG's proposed injunction prevents either Movaenzadeh from opening a gym or parents from joining the gym. It merely prevents Defendants from misusing confidential information[.]"[11] (Pl.'s

---

[11] This court notes that at the preliminary injunction hearing, Plaintiff's Counsel began his remarks by emphasizing that the requested injunction would not prevent Defendant Moavenzadeh from opening a gym or coaching, nor would it prevent parents from contacting him and enrolling their children at the facility of their choosing.

- 24 -

Reply (Doc. 25) at 10—11.) Plaintiff stresses that "[t]o the extent that [] prohibition interferes with Moavenzadeh's operation of a gym, that is a problem he created for himself, it does not tip the balance of equities in his favor." (Id. at 11.)

This court agrees with Plaintiff. The preliminary injunction that Plaintiff has requested, and that this court will issue, does not require Unify to cease its operations. Thus, Defendants' concerns about parents losing "a space where their children can engage in the sport they love in a supporting, healthy, and safe environment[,]" (Defs.' TRO Br. (Doc. 15) at 19; Defs.' Prelim. Inj. Br. (Doc. 28) at 18), are unfounded at this early stage in the case.

As to Defendants' concern that the preliminary injunction will impact Moavenzadeh's "ability to contact and communicate with families with which he has a longstanding personal relationship," (Defs.' Prelim. Inj. Br. (Doc. 28) at 18), this court likewise agrees with Plaintiff. The preliminary injunction that this court will issue will not prevent Moavenzadeh from having any contact with former CHG clients. It merely bars him from using Plaintiff's confidential business data, such as client email lists, to make such contact. If Moavenzadeh's sworn statement is taken at its word, this prohibition will not impact his communications with former CHG clients with whom he has

- 25 -

longstanding relationships because he avers that he has not and will not use Plaintiff's confidential business data. (Moavenzadeh Aff. (Doc. 16-3) ¶ 30.) "Therefore, in accordance with Defendant Moavenzadeh's own sworn statement, the entry of this [preliminary injunction] will be minimally invasive. It will prevent Defendants from using information that they aver they have no intention of using." (TRO (Doc. 21) at 4.) Accordingly, this court concludes that the balance of equities tips decisively in Plaintiff's favor.

### D.  **Public Interest**

The final prong that Plaintiff must establish is that "an injunction is in the public interest." Winter, 555 U.S. at 20 (citations omitted). Plaintiff emphasizes that the public interest is served by "preventing unethical business behavior," which it argues "is exactly the circumstance that CHG is facing here as a result of Moavenzadeh's . . . computer trespass[.]" (Pl.'s Br. (Doc. 6) at 22 (internal quotation marks omitted) (quoting Philips Elecs. N. Am., 631 F. Supp. 2d at 724).)

Defendants disagree that the public interest would be served by the issuance of a preliminary injunction, arguing that "[t]here is no public interest served by using this Court's equitable power to save a business that has failed in the marketplace, that has been alleged to place its customers in

- 26 -

danger, and that has been rejected by the clients it seeks to serve." (Defs.' TRO Br. (Doc. 15) at 20.) Defendants also allege that Plaintiff's motive for initiating this case, and seeking a preliminary injunction, is to retaliate against Moavenzadeh for cooperating in a separate investigation into Plaintiff's former owner. (Defs.' Prelim Inj. Br. (Doc. 28) at 19.) Consequently, "[t]he public interest is not served by allowing CHG to co-opt this Court's equitable powers to advance CHG's potentially improper objective of" retaliation. (Id.)

This court rejects Defendants' arguments. If Plaintiff has truly been "rejected by the clients it seeks to serve" this fairly narrow preliminary injunction will in no way "save" its business. (Defs.' TRO Br. (Doc. 15) at 20.) And as to Plaintiff's "potentially" retaliatory motive, this court finds such allegations to be only speculation at this juncture. What is not speculation, but rather firmly grounded in a persuasive recognition by another court in this district, is that the requested preliminary injunction will serve the public interest by ensuring that a company can "develop[] its customer relationships and . . . share [that] confidential and proprietary information with its employees without fear it will end up in the hands of a competitor." Philips Elecs. N. Am., 631 F. Supp. 2d at 724 (citing Travenol Lab'ys, Inc. v. Turner, 30

- 27 -

N.C. App. 686, 691, 228 S.E.2d 478, 483 (1976)). Therefore, this court concludes that the issuance of a preliminary injunction is rooted in the public interest.

Lastly, Defendants maintain that if a preliminary injunction is issued, then it should expressly state that it does not apply to Moavenzadeh's clients developed independently of any alleged wrongful conduct. (Defs.' Prelim Inj. Br. (Doc. 28) at 19—20.) This court declines to include that limitation in the preliminary injunction. While there are parent affiants who contend they convinced Moavenzadeh to open a gym, (see e.g., Doc. 16-16 ¶ 6; Doc. 16-33 ¶ 7), Moavenzadeh has not persuaded this court that he did not use the information contained in the ICP reports in some fashion. As a result, this court declines to make an affirmative finding that suggests some or all of Unify's clientele was developed independent of Plaintiff's proprietary ICP data.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, this court concludes that Plaintiff has shown a likelihood of success on the merits of its North Carolina computer trespass claim, that Plaintiff will suffer irreparable harm in the absence of a preliminary injunction, and that the balance of equities and public interest favor a preliminary injunction.

Pursuant to Federal Rule of Civil Procedure 65, **IT IS THEREFORE ORDERED** that Plaintiff's motion for a preliminary injunction as requested in Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction with Request for Oral Argument, (Doc. 5), is **GRANTED IN PART** as follows:

**IT IS ORDERED** that, Defendants, and all those acting in concert or participation with them, are hereby **PROHIBITED AND ENJOINED** from disclosing, using, or relying upon Plaintiff's trade secrets, proprietary or confidential information, including customer lists, customer contact information, class or program enrollment information, and billing information, which were accessed by Defendant Moavenzadeh without authorization as described herein; and

**IT IS FURTHER ORDERED** that, Defendants **SHALL** preserve all data currently stored on computers over which they have possession, custody, or control, including personal digital assistants or mobile telephones, including any information stored on backup media, which currently stores, or which has stored, Plaintiff's confidential information, proprietary information, or trade secrets; and

**IT IS FURTHER ORDERED** that Defendants **SHALL** preserve all emails on any computer under their control, including internet mail servers, personal digital assistants, and other hardware,

- 29 -

that was at any time related to the solicitation or contact of Plaintiff's current or former clients; and

**IT IS FURTHER ORDERED** that Defendants are hereby **PROHIBITED AND ENJOINED** from using the Instagram accounts previously named "CHG.XCEL" and "CHG.MENS," now named "UNIFY.GYM" and "UNIFYGYM.MENS," (see supra ¶ 13); and

**IT IS FURTHER ORDERED** that security in the amount of $1,000.00, which has already been posted by Plaintiff, (Doc. 23), shall serve as the bond contemplated by Federal Rule of Civil Procedure 65(c); and

**IT IS FURTHER ORDERED** that Defendants **SHALL** each file with this court, within three (3) days of this Memorandum Opinion and Order, a statement under oath certifying their ongoing compliance with this Order.

**IT IS SO ORDERED.**

This the 12th day of January, 2022.

_William L. Osteen, Jr._
United States District Judge